**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TRACEY BAINTER,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>　　　　Defendant. | No. 13 C 9105<br><br>Magistrate Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tracey Bainter filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq, 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill.

2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler,* 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford,* 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on August 4, 2010, alleging that she became disabled on January 1, 2009, because of bipolar disorder, bulging and protruding discs, degenerative disc disease, nerve damage, and hearing loss. (R. at 17, 73, 125, 129, 289). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 17, 65–72, 76–83). On July 11, 2012, Plaintiff, represented by counsel, testified at a video hearing before an Administrative Law Judge (ALJ). (*Id.* at 14, 33–64). The ALJ also heard testimony from Stephanie G. Barnes, a vocational expert (VE). (*Id.* at 14, 59–62, 94).

The ALJ denied Plaintiff's request for benefits on July 27, 2012. (R. at 17–28). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date. (*Id.* at 19). At step two, the ALJ found that Plaintiff's cervical and lumbar degenerative disc disease with L5-S1 annular tear, right hip trochanteric bursitis, bipolar disorder, Attention Deficit/Hyperactivity Disorder (ADHD), borderline personality disorder, and alcohol abuse are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 20–21).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she could perform sedentary work, except that she can only "understand, remember, and carry out less than detailed tasks and she can maintain concentration, persistence, and pace for such tasks with no more than average production standards." (R. at 21). Based on Plaintiff's RFC, the ALJ determined at step four that Plaintiff was unable to perform any past relevant work. (*Id.* at 26–27). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that Plaintiff was "not disabled" under Medical-Vocational Guidelines § 201.28.[3] (*Id.* at 27). Plaintiff met the criteria for dispositive application of § 202.28 because she was defined as a younger individual with at least a high school diploma and is able to communicate in English. (*Id.*). Although Plaintiff's ability to perform all of the requirements of sedentary work was impeded by additional nonexertional limitations, the VE testified that Plaintiff's additional limitations do not significantly erode the unskilled sedentary occupational base. (*Id.* at

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

[3] The Medical Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (Grids) are based on vocational factors of age, education, and work experience in combination with each of the possible strength categories of work, i.e. sedentary, light, medium, heavy, and very heavy. Grids § 200.00(a). Where the findings of fact coincide with all of the criteria for one of the rules, the Grids will direct a conclusion as to whether the claimant is or is not disabled. *Id.* The rules are based on administrative notice of the numbers of jobs in the national economy at the various combinations of strength categories and vocational factors. *Id.* § 200.00(b). Where a rule directs a finding of not disabled, the existence of a significant number of jobs in the national economy is presumed for an individual who meets all the combined factors contemplated by the rule. *Id.* Where a given rule directs a finding of disabled, the absence of significant numbers of jobs is presumed. *Id.*

27–28, 61). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.* at 28).

The Appeals Council denied Plaintiff's request for review on November 5, 2013. (R. at 1–4). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart,* 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin,* 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evi-

dence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin,* 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff was first diagnosed with bipolar disorder at age 11. (R. at 246). She also has a long history of borderline personality disorder and, as a child, she was dyslexic with ADHD. (*Id.* at 270, 332). She began psychiatric care at age 12 and had multiple psychiatric hospitalizations in the Chicago area, including at Michael Reese Hospital. (*Id.* at 270, 332). Plaintiff has received periodic psychotherapy and psychiatric care ever since. (*Id.* at 270).

On September 13, 2010, Plaintiff began treating with Union County Counseling Services (UCCS) soon after she learned that her daughter and her daughter's boy-

friend had been arrested for the murder of their three-month-old child. (R. at 377–78). A counselor performed the first of several crisis/preliminary assessments and determined that Plaintiff had a lowered energy level but was not a current risk of harm to herself. (*Id.* at 378). Plaintiff had a saddened affect and impaired memory. (*Id.*). The counselor assigned Plaintiff a Global Assessment of Functioning (GAF) score of 51.[4] (*Id.*).

On December 28, 2010, James S. Peterson, Ph.D., performed a consultative mental status examination on behalf of the Commissioner. (R. at 269–72). Plaintiff reported depression symptoms, including suicidal ideations and insomnia. (*Id.* at 270). Plaintiff attempted suicide two months earlier following her grandson's murder. (*Id.*). Plaintiff reported occasional manic episodes, including a recent one where she rearranged furniture for no reason, leaving a mess. (*Id.* at 270, 272). She takes Xanax but stopped taking Seroquel due to lack of funds. (*Id.* at 270–71). She previously tried Trazadone, Doxepin, Geodon, and Cymbalta to alleviate her symptoms. (*Id.* at 271).

On examination, Dr. Peterson found Plaintiff to be lucid, alert, friendly, and cooperative. (R. at 271). She made appropriate eye contact and had normal speech. (*Id.*). She was oriented properly regarding time, place and person. (*Id.*). Plaintiff denied psychotic ideation but reported disturbing dreams about deceased relatives.

---

[4] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM-IV*). A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV* at 34.

(*Id.* at 272). Dr. Peterson diagnosed bipolar I disorder, most recent episode depressed, alcohol dependence, and polysubstance dependence, in remission. (*Id.* at 272).

On July 29, 2011, Plaintiff called the UCCS crisis line, requesting voluntary hospitalization information due to recent life stressors. (R. at 375–76). The counselor found that Plaintiff demonstrated hopeless thought content, dysphoric mood, and fair insight and judgment. (*Id.* at 376). The counselor concluded that Plaintiff's mental health symptoms were increasing, and her ability to function decreasing, as a result of anxiety and depression, which were exacerbated by her inconsistent employment. (*Id.*) The therapist assigned a GAF score of 51. (*Id.*). In a therapy session on August 30, 2011, the UCCS counselor observed that Plaintiff had an excessive guilt thought process, a dysphoric and anxious mood, impaired memory, attention and concentration, and poor insight and judgment. (*Id.* at 373–74). The counselor assigned a GAF score of 47.[5] (*Id.* at 374).

On August 31, 2011, Sara White, MSW, conducted an initial mental health assessment. (R. at 312–29). Plaintiff reported several previous suicide attempts, stating that she has poor impulse control when something goes wrong. (*Id.* at 312). She also reported frequent panic attacks and aggressive behavior when she is in groups. (*Id.* at 313). On examination, White observed psychomotor agitation,[6] fast/pressured

---

[5] A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV* at 34.

[6] Psychomotor agitation "is a series of unintentional and purposeless motions that stem from mental tension and anxiety of an individual. This includes pacing around a room,

speech, helpless thought content, irritable mood, impaired attention and concentration, and impaired memory. (*Id.* at 313–14). Plaintiff was restless and agitated, often speaking loudly during the interview. (*Id.* at 327). White concluded that Plaintiff has limited insight into her psychological needs, focusing instead on her medication concerns. (*Id.* at 327). White diagnosed bipolar disorder NOS, personality disorder NOS, and assigned a GAF score of 46. (*Id.* at 328).

On September 26, 2011, Ronald Johnson, M.D., conducted a psychiatric examination for UCCS. (R. at 332–34). Plaintiff reported multiple stressors, including work-related injuries and spinal stenosis with chronic pain. (*Id.* at 332). She described problems with decreased attention, daydreaming, inability to focus, poor concentration, and not starting or finishing tasks. (*Id.* at 333). She can go up to 1½ weeks with little or no sleep, increased energy, racing thoughts, irritability, hyper-talkativeness, impulsivity, increase in goal directed activity, and then will immediately "crash" and be bedridden for days, not cleaning up, not taking care of herself, low motivation, low self-esteem, hopelessness, and suicidal ideations. (*Id.* at 332). Plaintiff explained that when something goes wrong, she becomes impulsive and displays feelings of persecution. (*Id.*). These feelings are exacerbated by paranoia if she is off her medications. (*Id.*). She denied current suicidal ideations but acknowledged frequent passive death wishes. (*Id.*).

---

wringing one's hands, uncontrolled tongue movement, pulling off clothing and putting it back on and other similar actions." < https://en.wikipedia.org/wiki/Psychomotor_agitation>

On examination, Dr. Johnson noted that Plaintiff was disheveled with poor hygiene, poor dentition, and was very fidgety and restless. (R. at 333). Plaintiff's mood was depressed, affect blunted and depressed, thought process mildly circumstantial, and insight and judgment fair. (*Id.*). Dr. Johnson diagnosed bipolar I disorder, most recent episode depressed, alcohol abuse and borderline personality disorder, which are stressed by chronic psychiatric and medical illness, financial problems and an unstable living situation. (*Id.* at 334). He assigned a GAF score of 60. (*Id.*). Dr. Johnson changed her Seroquel XR to Seroquel 200mg, continued Trazadone, and discontinued Xanax. (*Id.* at 333).

On October 6, 2011, David J. Warshauer, Ph.D., conducted a psychological evaluation for UCCS. (R. at 335–36). Plaintiff reported "really bad bipolar, anger episodes, and depression." (*Id.* at 335). She acknowledged making "quite a few" suicide attempts, which have all been impulsive. (*Id.* at 336). On examination, Dr. Warshauer found Plaintiff's intelligence to be in the normal range although she does meet the criteria for ADHD and bipolar disorder. (*Id.*). Her affect was sad and tearful and her mood was depressed. (*Id.*). Dr. Warshauer diagnosed bipolar disorder, most recent episode depressed, ADHD combined type, alcohol abuse, and borderline personality disorder, and assigned a GAF score of 42. (*Id.*).

On October 17, 2011, Plaintiff called the UCCS crisis line while she was in Chicago visiting her family. (R. at 371–72). Plaintiff was tearful recalling the murder of her grandson. (*Id.* at 371). The counselor found that Plaintiff's speech was fast/pressured, her thought process incoherent, and her insight and judgment poor.

(*Id.* at 372). The counselor concluded that Plaintiff's mental health symptoms were increasing and her ability to function decreasing and assigned a GAF score of 47. (*Id.*).

Plaintiff began treating with Judith Werckle, B.A., a UCCS counselor, in November 2011. (R. at 341). Over the next several months, Plaintiff missed numerous appointments due to lack of transportation resources and her physical health conditions. (*Id.* at 360). On January 1, 2012, Plaintiff reported anxiety, anger, and ADHD behaviors. (R. at 357). Werckle concluded that Plaintiff continues to struggle using resources effectively. (*Id.*). On January 12, 2012, Werckle opined that Plaintiff is unable to make therapeutic progress because of a lack of resources and associated life stressors. (*Id.* at 311). On March 15, 2012, Werckle noted "no progress" in Plaintiff's therapy, related partly to recent "heavy stressors" and her inability to consistently attend therapy sessions. (*Id.* at 360). Werckle and Plaintiff agreed to try telephone sessions until Plaintiff has the means to attend in person. (*Id.*). On March 20, 2012, Werckle again noted "no progress" with Plaintiff's mental health symptoms because of numerous life stressors—she has no transportation resources, reliable phone service, financial means, or public services established. (*Id.* at 361).

On March 9, 2012, Plaintiff called the UCCS crisis line, explaining that the police were at her home after her boyfriend had "trashed her apartment." (R. at 369–70). The counselor concluded that Plaintiff's insight was fair and her judgment poor. (*Id.* at 370). The counselor determined that Plaintiff was a suicide risk and assigned her a GAF score of 50. (*Id.* at 369–70).

On April 9, 2012, Plaintiff called the UCCS crisis line, complaining that she was extremely upset and making suicidal statements. (R. at 367–68). The counselor found that Plaintiff was agitated with irrational thinking and impaired judgment, attention and concentration. (*Id.* at 368). The counselor opined that Plaintiff's thought content demonstrated suicidal thoughts, hopelessness, obsessions, and compulsions. (*Id.* at 368). Plaintiff's affect was labile and elevated, her speech fast and pressured, and her thought process tangential. (*Id.*). The counselor concluded that Plaintiff's bipolar disorder was cycling,[7] and assigned a GAF score of 43. (*Id.*).

At the hearing on July 11, 2012, Plaintiff testified that she gets depressed, and has trouble following through with tasks. (R. at 45, 50). When she is depressed, she cannot get out of bed on some days. (*Id.* at 45, 55). She won't eat and will be in the same clothes for days at a time. (*Id.* at 55). There are other days when her anxiety level gets so high that she cannot focus or concentrate; she gets disoriented and cannot eat or sleep. (*Id.* at 53, 54).

Plaintiff frequently finds herself in situations where she acts impulsively and does not make wise decisions. (R. at 46, 53). She is irritable and cannot get along with people. (*Id.* at 53). Sometimes her memory is impaired. (*Id.* at 54–55) ("I actually have loss of time—almost like a kind of blackout. . . . There's days I don't even recall what I did all day. I consistently have to write myself lists and set

---

[7] "A severe form of [bipolar] disorder is called Rapid-cycling Bipolar Disorder. Rapid cycling occurs when a person has four or more episodes of major depression, mania, hypomania, or mixed states, all within a year. Rapid cycling seems to be more common in people who have their first bipolar episode at a younger age." <www.nimh.nih.gov/health/publications/bipolar-disorder-in-adults> (footnote omitted).

alarms . . . ."). Her Seroquel prescription is of some help, but she frequently cannot afford it because of lack of insurance. (*Id.* at 38). She stated that both her psychological and physical ailments hinder her ability to sustain any type of work activity. (*Id.* at 56).

# V. DISCUSSION

Plaintiff contends that the ALJ failed to explain how the medical evidence supported his conclusion that Plaintiff retains the capability to perform work-related activities. (Mot. 1). Specifically, Plaintiff asserts that (1) the ALJ improperly assessed her mental impairment; (2) the ALJ failed to include moderate limitations in concentration, persistence and pace when assessing her mental RFC; (3) the ALJ improperly assessed her physical RFC; and (4) the ALJ improperly assessed her credibility. (*Id.* 8–20).

## A. The RFC Did Not Fully Account for Plaintiff's Mental Impairments

The ALJ determined that Plaintiff's cervical and lumbar degenerative disc disease, right hip trochanteric bursitis, bipolar disorder, ADHD, borderline personality disorder, and alcohol abuse are severe impairments. (R. at 19). The ALJ also concluded that Plaintiff's mental impairments result in "moderate to severe impairment in social, occupational, and academic functioning." (*Id.* at 20). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform the full range of

sedentary work,[8] except that Plaintiff can only "understand, remember, and carry out less than detailed tasks and she can maintain concentration, persistence, and pace for such tasks with no more than average production standards." (*Id.*).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR)[9] 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R.

---

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[9] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); see 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administering." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

§ 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court concludes that the ALJ failed to fully consider the effects of Plaintiff's mental illness on her ability to work. First, the ALJ erred by handpicking which evidence to evaluate while disregarding other critical evidence. *See Scrogham v. Colvin*, 765 F.3d 685, 696–99 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). From July 2010 through April 2012, Plaintiff was diagnosed with bipolar disorder, personality disorder, ADHD, and alcohol abuse. (R. at 241, 272, 328, 334, 336). Throughout this time period, her doctors and therapists consistently found that Plaintiff's mental health symptoms were increasing and her ability to function was decreasing. (*Id.* at 376, 327, 332, 336, 372, 360, 370, 368). Plaintiff frequently experienced suicidal ideations. (*Id.* at 270, 332, 369–70, 368). On at least once occasion, Plaintiff's bipolar disorder was cycling. (*Id.* at 368).

The ALJ discounts this evidence, highlighting instead two instances when she reported to her primary care physician that her bipolar disorder was "doing better." (R. at 23; *see id.* at 240, 241). Based on these isolated instances, the ALJ concluded that Plaintiff's "bipolar disorder was improving." (*Id.* at 23). "But by cherry-picking [the medical file] to locate a single treatment note that purportedly undermines [the

treating doctors' and therapists'] assessment of [the claimant's] functional limitations, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). As the Seventh Circuit has explained on numerous occasions, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Id.* Indeed, despite Plaintiff's report to her primary care physician that she was "doing better," the doctor referred her less than six months later for psychiatric counseling. (R. at 295).

The ALJ similarly emphasized that the consultative mental status examination indicated only moderate limitations. (R. at 23, 25). While Plaintiff generally exhibited only moderate symptoms at the consultative examination, she also reported symptoms of depression, including having no purpose in life, feeling suicidal, and making a recent suicide attempt following her grandson's murder. (*Id.* at 270). Plaintiff also reported recent manic episodes where she rearranges the furniture leaving a mess. (*Id.*). Dr. Peterson also noted that Plaintiff has disturbing dreams about deceased relatives. (*Id.* at 272). In any event, Dr. Peterson reviewed very few medical records before drawing his conclusions (*id.* at 269), and, as noted above, the ALJ cannot determine a claimant's mental limitations based on a snapshot of a single moment, *Punzio*, 630 F.3d at 710.

The ALJ erroneously concluded that Plaintiff experienced only *temporary* exacerbation of her symptoms and some suicide ideation in 2011 following her grandson's death but that her symptoms had improved thereafter. (R. at 24). On the con-

trary, Plaintiff's doctors and therapists consistently noted suicidal ideations for 18 months following her grandson's death in September 2010. (*See id.* at 270 (attempting suicide in October 2010), 312 (reporting several previous suicide attempts in August 2011), 332 (noting recent suicidal ideations in September 2011), 336 (acknowledging "quite a few" suicide attempts in October 2011), 369–70 (finding Plaintiff a suicide risk in March 2012), 368 (finding that Plaintiff's thought process demonstrated suicide thoughts in April 2012). Further, as discussed above, throughout the relevant time period, Plaintiffs doctors and therapists consistently found that Plaintiff's ability to function was deteriorating. (*Id.* at 376, 327, 332, 336, 372, 360, 370, 368). Indeed, on April 9, 2012, Plaintiff's therapist concluded that her bipolar disorder was cycling—she was experiencing multiple mood disturbance episodes. (*Id.* at 368).

The ALJ found Dr. Johnson's opinion "more persuasive" and gave "little weight" to the opinions of Dr. Warshauer, MSW White, and MSW Werckle. (R. at 24). The ALJ discounted the opinions of Dr. Warshauer, MSW White, and MSW Werckle because Plaintiff "missed several counseling appointments due to various reasons that offer evidence that [Plaintiff] is able to do more than she reports." (R. at 24). Plaintiff missed appointments due to traveling, working, and transportation problems. (*Id.*; *see id.* at 341, 354, 362). But Plaintiff's "inability to keep appointments is both a symptom of her mental illness and an aggravating factor." *Punzio*, 630 F.3d at 711. The ALJ also concluded that Plaintiff's "reported activities of traveling to Chicago and working are not consistent with serious impairments in functioning." (*Id.*

at 24). On the contrary, Plaintiff's attempts to work do not undermine her claims of disability. In 2009, Plaintiff lasted 30 days working at a golf course before reinjuring her back, and in March 2011, she lasted 10 days at another gulf course before a hand injury ended her employment.[10] (*Id.* at 42, 40). Plaintiff explained that these previous employers were people she knew and were sympathetic to her needs and impairments. (*Id.* at 45, 57, 184). Most employers would not be so indulgent. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, [she] is in fact working.").[11] Finally, being able to travel to Chicago to visit her family does not mean that Plaintiff is capable of full time work. *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) ("Many of the reasons offered by the administrative law judge for discounting the evidence of [claimant's treating physicians] suggest a lack of acquaintance with bipolar disorder. . . . This is just to say that the plaintiff is not a raving maniac who needs to be locked up."). Indeed, during this visit to Chicago, Plaintiff called the UCCS crisis line, tearfully recalling her grandson's murder. (*Id.* at 371). The therapist found that Plaintiff's speech was fast and pressured, her thought process incoherent, and her insight and judgment poor. (*Id.* at 372).

The ALJ erroneously discounted MSW White's opinion because it was based solely on Plaintiff's subjective reports. (R. at 23). If an opinion is "based *solely* on the

---

[10] The ALJ did not find that any of this work constituted "substantial gainful activity." (R. at 19).

[11] The ALJ also improperly discounted Plaintiff's credibility because of these occasional attempts to work. (R. at 26).

patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added); *see also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."). But here, White performed her own examination, observing psychomotor agitation, fast/pressured speech, helpless thought content, irritable mood, impaired attention and concentration, and impaired memory. (R. at 313–14). White also observed that Plaintiff was restless and agitated, often speaking loudly during the interview. (*Id.* at 327). Moreover, almost all diagnoses—especially mental health evaluations—require some consideration of the claimant's subjective symptoms, and here, Plaintiff's subjective statements were necessarily factored into White's analysis. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012 ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). And there is nothing in the record to suggest that White disbelieved Plaintiff's descriptions of her symptoms, or that White relied more heavily on Plaintiff's descriptions than her own clinical observations in concluding that Plaintiff was seriously impaired. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [Plaintiff's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *see also Ryan v. Comm'r*, 528 F.3d 1194,

1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations.").

The ALJ also discounted White's assessment because it relied too heavily on Plaintiff's suicidal ideations and Plaintiff indicated to other sources that she would not attempt suicide. (R. at 24). While Plaintiff did seek to minimize her suicidal statements, her doctors and therapists consistently observed suicidal ideations from September 2010 through April 2012. (*See id.* at 270 (attempting suicide in October 2010), 312 (reporting several previous suicide attempts in August 2011), 332 (noting recent suicidal ideations in September 2011), 336 (acknowledging "quite a few" suicide attempts in October 2011), 369–70 (finding Plaintiff a suicide risk in March 2012), 368 (finding that Plaintiff's thought process demonstrated suicide thoughts in April 2012). Further, Plaintiffs doctors and therapists consistently concluded that Plaintiff's ability to function was deteriorating and her bipolar disorder was cycling. (*Id.* at 376, 327, 332, 336, 372, 360, 370, 368).

The Commissioner contends that the ALJ gave little weight to White's opinion because she was not an acceptable medical source. (Resp. 9–10; *see* R. at 23). But the ALJ merely cited to SSR 06-03p, without further explanation. (R. at 23). The Court must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *accord Hanson v. Colvin*, 760 F.3d 759, (7th Cir. 2014) ("We are particularly concerned about the *Chenery* violations committed by

the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly."). In any event, while the opinions of social workers "cannot establish the existence of a medically determinable impairment," information from social workers "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06–03. SSR 06–03 further explains:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Thus, while White's opinion cannot be given controlling weight, it must, at a minimum, be properly evaluated.

Finally, the ALJ erroneously gave limited weight to Plaintiff's GAF scores "because the totality of the record, including [Plaintiff's] activities shows that she is moderately limited in mental functioning." While the American Psychiatric Association no longer uses the GAF metric, *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014), at the time of Plaintiff's psychological evaluations, clinicians still used GAF scores to indicate a "clinician's judgment of the individual's overall level of functioning." *DSM-IV* at 32. Here, Plaintiff's GAF scores of 42–60 indicate moderate to serious symptoms, including suicidal ideations, severe obsessional rituals and serious impairment in social and occupational functioning. *DSM-IV* at 34. It's true

that GAF scores are not *dispositive* of Plaintiff's disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (explaining that the GAF score does not necessarily reflect doctor's opinion of functional capacity because the score measures severity of both symptoms *and* functional level). Nevertheless, Plaintiff's GAF scores are *evidence* suggesting a far lower level of functioning than the ALJ assigned. *Yurt v. Colvin*, 758 F.3d 850, 859–60 (7th Cir. 2014) (Although the ALJ was not required to give any weight to individual GAF scores, "the problem here is not the failure to individually weigh the low GAF scores but a larger general tendency to ignore or discount evidence favorable to Yurt's claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning than that captured by the ALJ's hypothetical and mental RFC.").

The crux of the problem with the ALJ's opinion is that he ignored or minimized the views of the physicians and counselors who treated or examined Plaintiff over a 20-month period and, instead, found the opinion of Dr. Johnson—who examined Plaintiff on a single occasion—"more persuasive." *See Phillips v. Astrue*, 413 F. App'x 878, 885 (7th Cir. 2010) ("And that is the crux of the problem with the ALJ's decision. The ALJ did not simply discard the conclusions of [the physician's assistant]; rather, the ALJ's decision belittled the views of every medical professional who treated or examined Phillips and adopted the terse conclusions of the one doctor who had never met her."); *Punzio*, 630 F.3d at 710 ("But by cherry-picking [the medical file] to locate a single treatment note that purportedly undermines [the treating doctors' and therapists'] assessment of [the claimant's] functional limita-

tions, the ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness."). The ALJ's conclusion that Plaintiff can perform the *full* range of sedentary work with only minor nonexertional limitations is not supported by substantial evidence. The medical evidence suggests that Plaintiff's bipolar disorder, personality disorder, ADHD, and alcohol abuse would result in significant nonexertional limitations. (R. at 376, 327, 332, 336, 372, 360, 370, 368 (finding that Plaintiff's ability to function was deteriorating), 312, 332, 336, 369–70, 368 (exhibiting suicidal ideations), 368, 372, 376 (fair to poor insight and judgment), 313–14, 333, 368, 373–74 (impaired memory, attention and concentration)); *see Punzio*, 630 F.3d at 712 ("And the fact that Punzio is no longer suicidal and is not plagued by depression 24 hours a day says little about her abilities to understand and remember short instructions and to maintain attention for a two-hour segment."); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall seek appropriate expert medical advice to determine what effects Plain-

tiff's mental illnesses have on her ability to work. The ALJ shall then reassess Plaintiff's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563. "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted); *see Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) ("We keep telling the Social Security Administration's administrative law judges that they have to consider an applicant's medical problems in combination.") (collecting cases). The RFC shall be "expressed in terms of work-related functions" and include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. SSR 96-8p.

## B. The RFC Did Not Incorporate All Nonexertional Limitations

Even assuming that the ALJ properly weighed the physicians' and therapists' opinions, the ALJ's RFC assessment did not properly account for Plaintiff's functional limitations. The ALJ determined that Plaintiff was moderately limited in her ability to maintain concentration, persistence or pace. (R. at 21). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform the full range of sedentary work, except that Plaintiff can only "understand, remember, and carry out less than detailed tasks and she can maintain concentration, persistence, and pace for such tasks with no more than average production standards." (*Id.*).

In the Seventh Circuit, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt*, 758 F.3d at 857; *see O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical."); *Indoranto*, 374 F.3d at 473–74 ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record."); *see also* SSR 96–5p, at *5 (RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence"); 20 C.F.R. § 404.1545. "Among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace." *Varga v. Colvin*, —F.3d—, No. 14-2122, 2015 WL 4488346, at *4 (7th Cir. July 24, 2015); *see Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (hypothetical question "must account for documented limitations of 'concentration, persistence, or pace'"). Although it is not necessary that the ALJ use the precise terminology of "concentration, persistence or pace," the Court cannot assume that a VE is apprised of such limitations unless he or she has independently reviewed the medical record. *Varga*, —F.3d—, 2015 WL 4488346, at *4; *Yurt*, 758 F.3d at 857. Here, there is no evidence that the VE reviewed Plaintiff's medical history or heard testimony about Plaintiff's moderate limitations in concentration, persistence, or pace.

Indeed, the VE testified to having reviewed only Plaintiff's prior work and vocational background. (R. at 60).

The ALJ concluded that Plaintiff has moderate difficulties maintaining concentration, persistence, or pace. (R. at 21). But the ALJ did not address these difficulties in the hypothetical question he posed to the VE. (*Id.* at 61). "Because a hypothetical posed to a VE must incorporate all of [Plaintiff's] limitations supported by the medical record—including moderate limitation in concentration, persistence, and pace— . . . the ALJ committed reversible error." *Varga*, —F.3d—, 2015 WL 4488346, at *4; *see Yurt*, 758 F.3d at 857 (failure of ALJ to include in hypothetical moderate difficulties in concentration, persistence, and pace was reversible error).

Instead of posing a hypothetical that included moderate limitations in concentration, persistence or pace, the ALJ posited a person limited to "less than detailed tasks." (R. at 61). These terms refer to "unskilled work," which the regulations define as work that can be learned by demonstration in less than 30 days. 20 C.F.R. §§ 404.1568, 404.1520; (*see* R. at 27, 61) (ALJ equating "less than detailed tasks" to unskilled work). But "whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments—*e.g.*, with difficulties maintaining concentration, persistence, or pace—can perform such work." *Varga*, —F.3d—, 2015 WL 4488346, at *4. For this reason, the Seventh Circuit has repeatedly rejected the idea that a hypothetical like the one here "confining the claimant to simple, routine tasks . . . adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 858–

59 (citing *Stewart*, 561 F.3d at 685 (collecting cases)); se*e also Craft*, 539 F.3d at 677–78 (restricting claimant to unskilled, simple work does not account for his difficulty with memory, concentration, and mood swings); *Young*, 362 F.3d at 1004.

The ALJ's hypothetical also clarified that the individual "could maintain concentration, persistence and pace for such tasks with no more than average production standards." (R. at 29). But the ALJ failed to define "average production standards." *See Varga*, —F.3d—, 2015 WL 4488346, at *5 ("It is also problematic that the ALJ failed to define 'fast paced production.' Without such a definition, it would have been impossible for the VE to assess whether a person with Varga's limitations could maintain the pace proposed."). In any event, this limitation fails to account for Plaintiff's *moderate* difficulties in maintaining concentration, persistence or pace. *See Browning v. Colvin*, 766 F.3d 702, 705–06 (7th Cir. 2014) ("'maintain[ing] concentration, consistency and pace of no more than average production standards' . . . understated the plaintiff's work-related limitations, in particular her ability to understand, remember, and concentrate").

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall pose a hypothetical question that explicitly "account[s] for documented limitations of 'concentration, persistence, or pace.'" *Stewart*, 561 F.3d at 684.

## C. Other Issues

Because the Court is remanding on the RFC issues, the Court chooses not to address Plaintiff's other arguments. Nevertheless, on remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate whether Plaintiff has an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. The ALJ shall then reevaluate both Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings is **GRANTED**, and the Defendant's Motion for Summary Judgment [28] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: September 2, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge